JOURNAL ENTRY AND OPINION
{¶ 1} Plaintiff, Daniel Lentz ("Daniel"), appeals the trial court's rulings in its divorce decree granting him a divorce from defendant, Remona Lynn Lentz ("Lynn"). The parties were married in June of 1993, and their first child was born around three months later. Daniel joined the Marine Corps and served until 1997. Upon his discharge from the service, he joined the Cleveland Police Department as a patrolman. By this time the parties had a total of four children, including a set of twins born in 1998.
 {¶ 2} The testimony showed that they experienced significant marital problems following the birth of the twins and that Daniel frequently left the home for days at a time. The parties dispute the actual date that he permanently left the marital home: Daniel claims he officially separated from Lynn in March of 2001 and Lynn claims he permanently left when he filed for divorce in October of 2002.
 {¶ 3} It is undisputed that until Daniel filed for divorce, he continued to pay all the family's expenses, including rent, utilities, and car payments. After he filed for divorce, however, Daniel stopped paying the expenses and did not supply the family with money for groceries. Lynn's uncontroverted testimony showed that she relied on her family and handouts from the church to feed the children.
 {¶ 4} Nor does Daniel dispute that, in violation of a court order, he took the minivan Lynn was using to transport the children to school and, at the time of trial, he was storing it at a body shop. The minivan was not used between the time he took possession of it and the time of trial. Lynn, meanwhile, contacted her sister, who bought Lynn a used minivan and gave it to her. In the interim, Lynn's boyfriend drove her in his car.
 {¶ 5} Also undisputed was the fact that early in the marriage, while Daniel was away in the service, Lynn had been unfaithful to him. Additionally, prior to their separation, Lynn obtained a job with the city of Brook Park. She was terminated after three months, however, because she had been seen kissing a Brook Park policeman, whom Daniel confronted when the policeman was on duty. The policeman called in reinforcements and the incident resulted in a scene. The next day, Lynn was told to quit or be fired. Although Daniel argues that Lynn had been unfaithful to him with this policeman, she swore that she had only kissed him.
 {¶ 6} After Daniel filed for divorce, Lynn filed a motion for spousal and child support pendente lite. The court awarded her $1,250 per month for temporary spousal support and $1,133.34 per month for child support. Daniel requested a hearing on the amount of support awarded, but then agreed to pass the motion until final hearing in the case.
 {¶ 7} After numerous delays caused by Daniel's failure to provide discovery and his failure to be prepared for trial, the court convened the divorce hearing in October of 2004. After two days of testimony, the court scheduled the remainder of the trial for the beginning of 2005. In the middle of December 2004, however, Daniel's counsel filed a motion to withdraw as counsel because she claimed that Daniel had not paid his attorney fees for seven months. The trial court granted this motion six days after it was filed, and Daniel did not object to the ruling.
 {¶ 8} Because Daniel had to obtain new counsel, the court continued the remainder of the trial until March of 2005. After nearly a full day of testimony, Daniel's counsel moved for a mistrial because Daniel was prejudiced by the resignation of his counsel in the middle of trial. The court denied this motion, and also denied his post-trial motion for a new trial.
 {¶ 9} After a full trial, the court issued its judgment entry, which is the subject of this appeal. Under the appropriate assignment of error, we will discuss the individual decisions in the judgment entry. For his first assignment of error, Daniel states:
I. THE TRIAL COURT ERRED BY GRANTING ATTORNEY LORETTA A. COYNE'S MOTION TO WITHDRAW AS COUNSEL FOR PLAINTIFF-APPELLANT WITHOUT PLAINTIFF-APPELLANT'S CONSENT AND WITHOUT A HEARING AFTER THE TRIAL HAD COMMENCED AND ABUSED ITS DISCRETION BY DENYING PLAINTIFF-APPELLANT'S MOTION FOR MISTRIAL[.]
 {¶ 10} Daniel argues that the trial court erred when it allowed the counsel who had represented him from the beginning of the action two years earlier to resign in the middle of trial. He also argues that he was denied an opportunity to respond to the motion because the court granted it before any response time had run.
 {¶ 11} In a domestic relations proceeding, a party does not have a guaranteed right to counsel. DiGuilio v. DiGuilio,
Cuyahoga App. No. 81860, 2003-Ohio-2187, ¶ 16. Daniel relies onHall v. Solid Corporation (Dec. 3, 1985), Franklin App. No. 85AP-576, 1995 Ohio App. LEXIS 9489, in which the appellate court found prejudice to defendant when the trial court allowed counsel to withdraw on the day of trial yet required the trial to continue. In Hall, the appellate court held that defendants were unduly prejudiced by the trial court's actions.
 {¶ 12} In the case at bar, on the other hand, although the trial court granted the motion to withdraw filed by Daniel's counsel, the court also continued the trial for three months. Three months was more than sufficient time for Daniel's new counsel to review the file, read the transcript of what had occurred in the first two days of trial, and plan a strategy for the remainder of the trial. Moreover, Daniel was represented at the trial by his new counsel.
 {¶ 13} Finally, it is axiomatic that parties must preserve any issue they wish to raise on appeal. Daniel never complained about the discharge of his counsel until well into the second day of the resumed trial, after substantial testimony by two witnesses, and three months after counsel had withdrawn.
 {¶ 14} Furthermore, although his attorney told the court that he "would like to proffer something on that," Tr. 475, his proffer consisted merely of a statement of the case as it had proceeded to that date and that he believed "there are things that should have been presented to the Court on cross-examination of Ramona Lynn Lentz during * * * Plaintiff's case in chief." Tr. 477. He does not specify what should have been presented. Again, speaking only in generalities, he concluded by saying that the delay in continuing the trial "over a period of five months" was "entirely inappropriate." Id. He then stated that he believed a mistrial was the only fair resolution. This purported proffer does not show specifically how Daniel was prejudiced in any way by the resignation of his former counsel or by the delay in the resumption of trial. As a result, Daniel has failed to demonstrate any prejudice resulting from the court's permitting his first counsel to resign from the case. The mere fact that Daniel's counsel was permitted to withdraw midway through the hearing does not prove prejudice to his case.
 {¶ 15} Accordingly, this assignment of error is overruled.
 {¶ 16} For his second assignment of error, Daniel states: II. THE TRIAL COURT ABUSED ITS DISCRETION BY ATTEMPTING TO DIVIDE THE MARITAL ASSETS AS OF THE DATE OF THE DIVORCE TRIAL INSTEAD OF THE DATE OF THE DE FACTO TERMINATION OF THE PARTIES' MARRIAGE.
 {¶ 17} Daniel argues that the trial court should have determined that the end of the marriage occurred earlier than the first day of trial in October of 2004. He alleges that he moved out of the home permanently in March of 2001, well before the first day of trial in October of 2004. The de facto end of the marriage, he claims, should be March of 2001. By assigning a date years later, he claims, the trial court prejudiced him because his pension and other monetary benefits continued to accrue as marital assets to be divided.
 {¶ 18} The legislature has defined how a trial court should determine the dates of the marriage:
(2) "During the marriage" means whichever of the following is applicable:
(a) Except as provided in division (A)(2)(b) of this section, the period of time from the date of the marriage through the date of the final hearing in an action for divorce or in an action for legal separation;
(b) If the court determines that the use of either or both of the dates specified in division (A)(2)(a) of this section would be inequitable, the court may select dates that it considers equitable in determining marital property. If the court selects dates that it considers equitable in determining marital property, "during the marriage" means the period of time between those dates selected and specified by the court.
R.C. 3105.171.
 {¶ 19} This statute provides the court with broad discretion to decide what period of time constitutes "during the marriage." This court has previously explained: "The determination as to when to apply a valuation date other than the actual date of divorce is within the discretion of the trial court and cannot be disturbed on appeal absent a demonstration of an abuse of discretion." Gullia v. Gullia (1994), 93 Ohio App.3d 653, 666. The court chose the first date of the final hearing as the termination date of the marriage. It stated in its Judgment Entry, "[t]he Court finds no reason to deviate from the statutory definition of `during the marriage.'" At 12.
 {¶ 20} Daniel points to testimony in which he stated he vacated the marital home in 2001; Lynn, on the other hand, testified that, although Daniel often spent days at a time away from home, he did not permanently leave until he filed for divorce. Daniel presented no evidence that prior to the date of filing he leased another residence or that he in any way established a separate residence until after he filed for divorce. Rather, he testified that he sometimes would sleep at his parents' home or his brother's home and that he lived for a while at a house his father owns on West 68th Street. Although Daniel's mother testified at trial that she gave Daniel a loan, she never testified as to his living or staying in her home. Only Daniel testified concerning his living arrangements between March 2001 and October 2004.
 {¶ 21} Daniel later testified, moreover, that he did not sign a lease on a separate residence until just prior to filing for divorce. He also admitted that once he filed for divorce and moved into the duplex he rented, he stopped paying all the bills on the marital home, including rent, electricity, gas, and the insurance on the van wife used. He additionally admitted that he had filed his income taxes in 2002 as head-of-household. Daniel has thus failed to support his claim that he permanently left the marital home in 2001. When it weighed the evidence, the trial court did not abuse its discretion in concluding that Daniel did not leave the marriage until he filed for divorce in October of 2002.
 {¶ 22} Accordingly, this assignment of error lacks merit.
 {¶ 23} For his third assignment of error, Daniel states: III. THE TRIAL COURT ERRED BY FAILING TO DETERMINE THE VALUE OF PLAINTIFF-APPELLANT'S INTEREST IN THE POLICE FIREMAN'S DISABILITY AND PENSION FUND AND ABUSED ITS DISCRETION BY FAILING TO EFFECTUATE AN EQUITABLE DIVISION OF THE MARITAL ASSETS.
 {¶ 24} Daniel raises two arguments under this assignment of error. First, he argues that the court should have divided the interest in the pension fund as of the March 2001 date. We discussed this issue above in the second assignment of error and need not discuss it again.
 {¶ 25} Second, Daniel argues that "[t]he trial court did not determine the present value of [Daniel's] pension as of any date certain. Instead, the court accepted the estimates of [Lynn's] attorney as the amount of total contributions made by [Daniel] to the [retirement fund] from his date of hire on August 4, 1997 through December 31, 2004." Appellant's brief at 18. Daniel then complains of the method the court used to divide the marital portion of the fund, as well as the use of the December 31, 2004 date.
 {¶ 26} It is well settled that "[a] vested pension plan accumulated during marriage is a marital asset * * *." Holcombv. Holcomb (1989), 44 Ohio St.3d 128, syllabus. Further, the trial court is granted significant discretion in determining how to factor the pension in the division of the parties' assets. "The trial court must have the flexibility to make an equitable decision based upon the circumstances of the case, the status of the parties, the nature, terms and conditions of the pension plan, and the reasonableness of the result." Hoyt v. Hoyt
(1990), 53 Ohio St.3d 177, 180. Absent an abuse of discretion, therefore, this court will not disturb the trial court's determination of the value of the pension plan or the amount allocated to Lynn.
 {¶ 27} Daniel's concerns over the amount of money Lynn's counsel stated was the present value of the pension are misplaced. Ignoring the fact that Daniel himself never provided the court with any values for the pension, we note that any monetary value the pension has at this time is inconsequential because those pension benefits are not yet mature.
Unmatured pension benefits are those not currently due and payable. * * * In distributing such pension benefits, the trial court may either determine the parties' proportionate shares at the time of the divorce or determine proportionality when the benefits mature. * * *
In either case, the non-employee spouse generally is entitled to share only in the actual marital asset. * * * The domestic relations court uses the coverture formula primarily as a mechanism to value the non-employee spouse's entitlement to the asset.
Younkin v. Younkin (Dec. 22, 1998), Franklin App. No. 98AP-419, 1998 Ohio App. LEXIS 6258 at *5, internal citations omitted.
 {¶ 28} In the case at bar, the trial court used the coverture method to determine only part of the parties' proportional shares and deferred payment of Lynn's share until those benefits are ripe. The trial court found:
* * * ten percent of [Daniel's] gross earnings with the City of Cleveland are deducted from his pay and contributed to the Ohio Police Firefighters Pension Fund on his behalf. * * * The Court further finds that through December 30, 2004 [Daniel's] total gross earnings were Three Hundred Thirty Eight Thousand Two Hundred Forty-Three Dollars and Sixty-Eight Cents ($338,243+68) * * * and that the total contributions to the Ohio Police 
Firefighters Pension Fund were Thirty Three [sic] Thousand Eight Hundred Twenty-Four Dollars ($33,824.00).
The Court further finds that the parties agreed that the marital portion of [Daniel's] pension benefits would be equally divided between the parties but that the parties could not agree upon the termination date of the marriage for the purpose of dividing said funds.
Journal Entry at 4. Although the court included these figures, the court did not use this information to determine any final amount Lynn will collect on the pension.[1]
 {¶ 29} Rather, the court provided a basis for a fraction, part of which was to be filled in much later.
[Daniel's] retirement benefits available through the Ohio Police Firefighters Pension Fund shall be equally divided via a Division of Property Order using a coverture fraction whereby [Lynn] shall receive fifty percent (50%) of the `marital portion' of the retirement benefits available to [Daniel], applying the coverture fraction (8 as years of the marriage during the period of time when [Daniel] was employed by the City of Cleveland as the numerator (8/4/97 to 10/19/04) and the total years of [Daniel's] service as the denominator) applied to the total amount of retirement benefits available to [Daniel] upon his retirement of separation from service.
Judgment Entry at 12.
 {¶ 30} At this time, it is not possible to compute the amount Lynn will receive; the total value of the pension depends upon how many years Daniel remains on the police force and his highest salary at the time of his retirement. Certainly, the percentage of the pension that will be Daniel's alone will increase each year he works for the police following the divorce, and Lynn's percentage will be smaller. But the actual value of the pension cannot be determined at the present because it is not fully matured. As the Eleventh District Court of Appeals has explained:
"When distribution of pension benefits is deferred until the benefits are vested and matured, the non-employee spouse * * * is usually entitled only to share in the actual marital asset. The value of this marital asset is calculated by the ratio of the number of years of the employee spouse's employment * * * during the marriage to the total number of years of his or her employment." 46 Ohio Jurisprudence 3d (1994), Family Law, Section 494. Weller v. Weller, Geauga App. No. 2001-G-2370, 2002-Ohio-7125, ¶ 33.
 {¶ 31} Daniel's complaint that the court erred in determining the present value of his pension, therefore, is without merit. Also inconsequential is the trial court's noting the value of the pension as of the end of December of 2004 instead of as of October 2004. In the Judgment Entry, the court specified that the dates of the marriage, for the purpose of dividing the pension, were "(8/4/97 to 10/19/04)." The court used the correct date, therefore, in determining the dates of the pension of which Lynn was entitled to a share.
 {¶ 32} The trial court did not err when it ruled on the future basis for dividing the marital portion of Daniel's pension. Accordingly, this assignment of error is overruled.
 {¶ 33} For his fourth assignment of error, Daniel states: IV. THE TRIAL COURT ERRED BY FAILING TO ADDRESS PLAINTIFF-APPELLANT'S REQUEST FOR ORAL HEARING AND TO MODIFY TEMPORARY SUPPORT PURSUANT TO CIVIL RULE 75(N) AND ABUSED ITS DISCRETION BY FAILING TO MODIFY THE TEMPORARY SUPPORT ORDER RETROACTIVE TO ITS EFFECTIVE DATE.
 {¶ 34} Once Daniel filed his complaint for divorce, Lynn filed a motion for spousal support pendant lite and for child support. The magistrate ordered Daniel to pay $1,133.34 per month in child support and $1,250.00 per month in spousal support during the pendency of the litigation. Daniel filed a motion for an oral hearing on the amount of the temporary order, because he believed it was excessive and because he could not financially pay the ordered amount. Nonetheless, after the court had scheduled the hearing and taken some testimony, Daniel agreed to wait for the ruling on the temporary support issue until the final hearing. He points out in his appellate brief that, although his counsel argued at the final hearing for a revision of the amount ordered as temporary support, the trial court did not explain or rule on the issue in its judgment entry; the court merely ordered that the temporary support remain in effect until the last day of the month that judgment in the case was filed. The court's support order in the decree reduced the amount due to $860 per month in child support and $1,000 per month in spousal support beginning after the date the temporary support ended.
 {¶ 35} Daniel claims that the amount garnished from his paycheck exceeds the percentage permitted by law. R.C. 3121.033, which allows the court to order garnishment of an obligor's wages, states:
If a court or child support enforcement agency is required to issue one or more notices or orders described in section 3121.03
of the Revised Code, the court or agency to the extent possible shall issue a sufficient number of the notices or orders to provide that the aggregate amount withheld or deducted under those notices or orders satisfies the amount ordered for support in the support order plus any arrearages owed by the obligor under any prior support order that pertained to the same child or spouse, notwithstanding the limitations of sections 2329.66,2329.70, 2716.02, 2716.041 [2716.04.1], 2713.05,* 2716.13, and 4123.67 of the Revised Code. However, in no case shall theaggregate amount withheld pursuant to a withholding notice described in section 3121.03 of the Revised Code and any fees withheld pursuant to the notice as a charge for services exceedthe maximum amount permitted under section 303(b) of the"Consumer Credit Protection Act," 15 U.S.C. 1673(b). (Emphasis added.)
Daniel claims that the amount of temporary support ordered exceeds the 65% cap imposed by the federal statute, which reads:
(a) Maximum allowable garnishment. Except as provided insubsection (b) and in section 305 [15 USCS § 1675], the maximum part of the aggregate disposable earnings of an individual for any workweek which is subject to garnishment may not exceed
(1) 25 per centum of his disposable earnings for that week, or
(2) the amount by which his disposable earnings for that week exceed thirty times the Federal minimum hourly wage prescribed by section 6(a)(1) of the Fair Labor Standards Act of 1938 [29 USCS § 206(a)(1)] in effect at the time the earnings are payable, whichever is less. In the case of earnings for any pay period other than a week, the Secretary of Labor shall by regulation prescribe a multiple of the Federal minimum hourly wage equivalent in effect to that set forth in paragraph (2).
(b) Exceptions.
(1) The restrictions of subsection (a) do not apply in thecase of —
(A) any order for the support of any person issued by a courtof competent jurisdiction or in accordance with an administrativeprocedure, which is established by State law, which affordssubstantial due process, and which is subject to judicialreview.
(B) any order of any court of the United States having jurisdiction over cases under chapter 13 of title 11 of the United States Code [11 USCS §§ 1301 et seq.]
(C) any debt due for any State or Federal tax.
(2) The maximum part of the aggregate disposable earnings ofan individual for any workweek which is subject to garnishment toenforce any order for the support of any person shall not exceed—
(A) where such individual is supporting his spouse or dependent child (other than a spouse or child with respect to whose support such order is used), 50 per centum of such individual's disposable earnings for that week; and
(B) where such individual is not supporting such a spouse ordependent child described in clause (A), 60 per centum of suchindividual's disposable earnings for that week; except that,
with respect to the disposable earnings of any individual for any workweek, the 50 per centum specified in clause (A) shall be deemed to be 55 per centum and the 60 per centum specified inclause (B) shall be deemed to be 65 per centum, if and to theextent that such earnings are subject to garnishment to enforce asupport order with respect to a period which is prior to thetwelve-week period which ends with the beginning of suchworkweek.
(c) Execution or enforcement of garnishment order or process prohibited. No court of the United States or any State, and no State (or officer or agency thereof), may make, execute, or enforce any order or process in violation of this section.
15 USCS § 1673, emphasis added.
 {¶ 36} Daniel does not dispute that CSEA has found him to be in arrears; he had not paid any child support between the time the temporary order was made and the time his wages were actually garnished, a period from October of 2002 until late March of 2003. Rather, in addition to claiming that the amount of temporary support was too high, he also claimed that it exceeded 65% of his net pay. He does not, however, calculate the numbers to demonstrate that the temporary support ordered exceeded 65% of his net pay.
 {¶ 37} Net pay is not a hard and fast number; it is affected by the number of dependants the taxpayer claims,[2] the amount he has deducted for deferred compensation, any charitable deductions he has authorized, and the amount of automatic payments he has authorized from his check. The evidence showed that defendant had authorized a deduction for his deferred compensation of $75 per pay. From his gross pay, he also had car payments deducted for two vehicles: the one he used and the van he had taken away from Lynn. He admitted in testimony that the van was stored at a body shop and that he was still making payments on it.[3]
 {¶ 38} Further, during the pendency of this case, defendant had received a settlement of approximately $34,000 for an accident he had been in. He was unable to account for his use of $22,000 of this money, but Lynn testified that she and their children saw him moving a big screen TV into his home. The court acknowledged this sum was not subject to consideration as part of Daniel's income, but held, "[Daniel] shall retain the net benefits received via settlement proceeds by virtue of his lawsuit/worker's compensation claim, free and clear of any claim on the part of [Lynn], except as set forth hereinbelow." Judgment Entry at 14. The court then listed the arrearages Daniel owed in support, his prospective support obligation, and the award of attorney fees to Lynn.
 {¶ 39} Finally, defendant admitted that he had not filed his 2003 tax return and that in the past he had received between $3,000 and $4,000 in refunds every year. The court found that Daniel "has delayed filing the tax returns to avoid the collection of temporary arrearage by [Lynn] via tax intercepts filed by CSEA." Judgment Entry at 6.
 {¶ 40} The court also noted although that defendant had, in years past, supplemented his income by doing security work, roofing, and modeling, Daniel testified that he had not done this extra work since he filed for divorce. The court found, however, that "review of [Daniel's] account with the Cleveland Police Credit Union shows additional deposits from sources other than [Daniel's] payroll and that [Daniel] acknowledged that any such deposits would have come from such additional employment."[4] Judgment Entry at 7.
 {¶ 41} Daniel complains that the amount of temporary support was too high for the amount of his net pay and that therefore the arrearage should be reduced to the amount it would be if the court had ordered the support to be retroactively modified to the amount awarded in the final decree. The court found, however, that the divorce proceedings were significantly delayed because of Daniel's failure to comply with discovery and his appearance on one trial date at which he claimed to be unprepared, necessitating a postponement of trial. The higher amount of support garnished from his check during the period of his self-imposed delay, the court concluded, was the result of his own dilatory actions.
 {¶ 42} Defendant presents us with no law to support his claim that the court must explain in the judgment entry the basis for deciding temporary support. Further, the court is not required to explain why the amount awarded for temporary support differs from the amount awarded in the decree.
A temporary order is merely an order to provide for the needs of the parties during the pendency of the divorce action. The trial court has discretion to order an amount different from the temporary order after final hearing, even without evidence of a change in circumstances. The trial court need not justify a difference between a temporary and a permanent child support award. Martin v. Martin, Cuyahoga App. Nos. 79219, 79388, 2001 Ohio App. LEXIS 5736.
Schumann v. Schumann, Cuyahoga App. No. 83404 83631,2005-Ohio-91, ¶ 50.
 {¶ 43} Daniel failed to prove that the amount of support he was ordered to pay exceeded the amount permitted by law. Without his presenting proof that his current net pay is the maximum he could receive and that the amount ordered exceeded the statutory limit of 60% of this amount, his claim lacks merit. The trial court did not err in the amount of spousal support it awarded, both before and after the decree. Accordingly, this assignment of error is overruled.
 {¶ 44} For his fifth assignment of error, Daniel states: V. THE TRIAL COURT ABUSED ITS DISCRETION IN ITS DETERMINATION OF THE AMOUNT AND DURATION OF TEMPORARY AND PROSPECTIVE SPOUSAL SUPPORT.
 {¶ 45} The trial court ordered Daniel to pay spousal support of $1,000 per month for thirty months. Daniel argues that the award of spousal support is erroneous because the court found only one statutory factor favoring an award of support: that she has care of minor children in the home. Further, he alleges, Lynn is living with her boyfriend and therefore cohabitating as defined by Ohio law; he has custody of the children "nearly half the time;" and the youngest two children will be in school full time a few months after the decree was issued. Lynn could work, he argues, while the children are in school and on the days when they are with him.
 {¶ 46} The trial court determines spousal support by considering a number of factors listed in R.C. 3105.18, which states in pertinent part:
(C) (1) In determining whether spousal support is appropriate and reasonable, and in determining the nature, amount, and terms of payment, and duration of spousal support, which is payable either in gross or in installments, the court shall consider all of the following factors:
(a) The income of the parties, from all sources, including, but not limited to, income derived from property divided, disbursed, or distributed under section 3105.171 [3105.17.1] of the Revised Code;
(b) The relative earning abilities of the parties;
(c) The ages and the physical, mental, and emotional conditions of the parties;
(d) The retirement benefits of the parties;
(e) The duration of the marriage;
(f) The extent to which it would be inappropriate for a party, because that party will be custodian of a minor child of the marriage, to seek employment outside the home;
(g) The standard of living of the parties established during the marriage;
(h) The relative extent of education of the parties;
(i) The relative assets and liabilities of the parties, including but not limited to any court-ordered payments by the parties;
(j) The contribution of each party to the education, training, or earning ability of the other party, including, but not limited to, any party's contribution to the acquisition of a professional degree of the other party;
(k) The time and expense necessary for the spouse who is seeking spousal support to acquire education, training, or job experience so that the spouse will be qualified to obtain appropriate employment, provided the education, training, or job experience, and employment is, in fact, sought;
(l) The tax consequences, for each party, of an award of spousal support;
(m) The lost income production capacity of either party that resulted from that party's marital responsibilities;
(n) Any other factor that the court expressly finds to be relevant and equitable.
 {¶ 47} Daniel concedes that in its judgment entry the court discussed each factor, but claims it found only one to be applicable: Lynn's having the care of minor children. A review of the court's journal entry, however, shows that the court also noted that Lynn had only a high school education and had been out of the work force for ten years while she raised the children. Although the court did not explicitly find a loss of earning capacity from being out of the work force, this conclusion is implicit in the amount of spousal support ordered. The court also ruled that, although Lynn would be able to work once the youngest two children were in school, her employment would be limited to part time. The court further ruled that spousal support would be deductible to Daniel and taxable to Lynn.
 {¶ 48} Daniel had argued that Lynn was not entitled to spousal support because she was, he alleged, cohabiting with her boyfriend. The court did not find, however, and the evidence did not show, that Lynn was cohabiting with her fiance. Daniel testified that he saw the fiance's car in her driveway frequently, but regular visiting does not equal cohabiting.
 {¶ 49} The trial court found adequate factors existed pursuant to the statute to justify the award of spousal support. Daniel has failed to demonstrate that the trial court erred in awarding thirty months of spousal support at $1,000 per month. Accordingly, this assignment of error is overruled.
Affirmed.
It is ordered that appellee recover of appellant her costs herein taxed.
The court finds there were reasonable grounds for this appeal. It is ordered that a special mandate issue out of this court directing the Common Pleas Court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
James J. Sweeney, P.J., concurs.
 Michael J. Corrigan, J., concurs in judgment only.
[1] The court went on to note that "each of the parties, after the division of [Daniel's] retirement benefits and Ohio Public Employees Deferred Compensation account, will have equal retirement benefits." J.E. at 8.
[2] The IRS reduces the amount it withholds from a paycheck by a certain percentage for each dependant claimed.
[3] Although Daniel tried to convince the court that he had converted his purchase of the van to a lease, he presented no evidence of said lease nor evidence of a transfer of the title of the van to the lessor. The trial court held, therefore, that Daniel had purchased the van. Daniel admitted that he had made no attempt to sell the van. He also admitted that by taking the van away from Lynn he violated an express court order that he not interfere with Lynn's use of the van.
[4] The trial court also commented on Daniel's failure to pay support in any form over the winter of 2002-2003; the court found Daniel's "failure to support his spouse and the four minor children of the parties was egregious and contumacious." Journal Entry at 9. When asked at trial whether he was concerned that his children would not have heat during the winter, Daniel replied, "No." Tr. at 284. When asked how he expected his children to eat, he responded that Lynn's boyfriend would buy them food. He also admitted that he did not know whether the electricity had been shut off for nonpayment in the house his children lived in.